***********
Upon review of the competent evidence of record with reference to the errors assigned, and considering the briefs and oral arguments of the parties, the Full Commission finds no good grounds to receive further evidence, or to rehear the parties or their representatives. Upon reconsideration of the evidence, the Full Commission modifies the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into at the hearing as:
 STIPULATIONS *Page 2 
1. January 10, 2009 is the date of the onset of alleged disability in this occupational disease claim.
2. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. An employment relationship existed between the parties at all times relevant to these proceedings.
4. Plaintiff claims an alleged occupational disease for both of his upper extremities.
5. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One: Executed Pre-Trial Agreement;
 b. Stipulated Exhibit Two: Plaintiff's medical records;
 c. Stipulated Exhibit Three: North Carolina Industrial Commission forms and filings;
 d. Stipulated Exhibit Four: Portions of Plaintiff's personnel file;
 e. Stipulated Exhibit Five: Defendant's medical department records for Plaintiff;
 f. Plaintiff's Exhibit One: Seven photographs depicting paint booth operator position;
 g. Plaintiff's Exhibit Two: Three photographs of tree limb;
 h. Plaintiff's Exhibit Three: Photograph of tree limb on car;
 i. Defendant's Exhibit One: Photograph of tree limb on car;
 j. Defendant's Exhibit Two: Photograph of tree limb on car;
 k. Defendant's Exhibit Three: Photograph of rear of car. *Page 3 
 *********** ISSUES
The issues to be determined are:
1. Whether Plaintiff's right shoulder condition is a compensable occupational disease?
2. Whether Plaintiff's left shoulder condition is a direct and natural result of his allegedly compensable right shoulder condition?
3. Whether Plaintiff is entitled to any workers' compensation benefits?
4. Whether Defendant is entitled to a credit for payment of short-term and/or long-term disability benefits to Plaintiff?
5. What is Plaintiff's average weekly wage?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 52 years old, with a date of birth of February 1, 1959. Plaintiff has a general equivalency diploma (GED) and an employment history in landscaping, furniture manufacturing, and furniture textiles. Prior to his employment with Defendant Goodyear Tire Rubber Company (hereinafter, "Goodyear Tire"), Plaintiff had worked at Honeywell Performance Fibers, a polyester plant, on two separate occasions for a total of approximately 11 years. Although Plaintiff did some overhead lifting of items weighing as much as 45 pounds at Honeywell, he had no significant shoulder problems or symptoms while working there. *Page 4 
2. In 1985, Plaintiff underwent surgical removal of a cyst in his right shoulder, and had a right shoulder dislocation sometime in the 1990's, but no further shoulder problems since that time. Plaintiff disclosed his prior shoulder surgery on his employment entrance examination for Goodyear Tire.
3. On September 23, 2008, Plaintiff began working for Goodyear Tire as a press operator. After he finished his press operator training (which was around the last week of October 2008), he was assigned to the three-hundred row of the curing presses. The three-hundred row was shut down, however, so he became "available labor" to be assigned as needed throughout the plant.
4. Plaintiff ended up working as a paint booth operator the large majority of his time after becoming classified as "available labor." Plaintiff estimated that he worked as a paint booth operator approximately 80 to 85 percent of the time from the last week of October 2008 through the end of December 2008. Mr. Joseph Thornton, Goodyear Tire's area manager and Plaintiff's supervisor, corroborated Plaintiff's testimony concerning the amount of time he spent working as a paint booth operator.
5. According to Plaintiff, paint booth operators work in pairs. One employee pulls the tires off each level of a multi-level tire rack and flips them onto a conveyor belt so that they can be sprayed by a paint machine. The other employee takes the sprayed tires off the conveyor belt and throws them onto another multi-level tire rack, which requires flipping the tires over to the opposite side. The multi-level tire racks are approximately six feet tall, and there are three or four tiers on each tire rack, with three to six tires on each tier. Plaintiff is approximately five feet, eight inches tall. *Page 5 
6. The tires that Plaintiff handled while working as a paint booth operator were heavy truck tires, weighing up to 55-60 pounds each. In a 12-hour shift, Plaintiff would handle approximately 2,980 tires, or an average of one tire every eight seconds, not counting breaks. Plaintiff described the paint booth operator position as "constantly turning and throwing tires." Because Plaintiff is right-hand dominant, he relied more on his right arm to exert the force required to pull, flip, and throw the tires off and onto the multi-level tire racks. Based upon Plaintiff's description of the configuration of the paint booth work station, which is accepted as credible, and the other competent evidence, the Full Commission finds that Plaintiff engaged in a significant amount of repetitive, heavy overhead lifting of tires while working as a paint booth operator.
7. In November 2008, Plaintiff started having pain in his arms and shoulders after performing his duties in the paint booth operator position. Plaintiff informed his co-workers about his shoulder symptoms. Before reporting to work for his 12-hour shift, Plaintiff would have his wife rub analgesic cream onto his arms and shoulders. Plaintiff's shoulder symptoms interfered with his activities at home to the point that on his days off, he would use a heating pad.
8. In December 2008, Plaintiff informed a nurse in Goodyear Tire's medical department about his shoulder symptoms when he went there for a hearing test. In response, the nurse advised him that it was just "job conditioning," and that he should just give himself time to get used to his new position. Through December 22, 2008, when Goodyear Tire closed for the Christmas break, Plaintiff continued to have significant right arm and shoulder problems. Over the Christmas break, Plaintiff continued to have right arm and shoulder problems such that he kept having his wife apply the analgesic cream and he kept using the heating pad. *Page 6 
9. On January 2, 2009, when Plaintiff returned to work, his arms and shoulders were sore, but his pain was manageable. However, on Plaintiff's third night back at work, his symptoms worsened to the point that he had to hold his right elbow against his right side just to be able to throw a tire with his right arm. By the end of Plaintiff's 12-hour shift, he had trouble lifting his right arm. He had to handle the tires with his left arm only and he had to operate his scanner gun with his left hand, even though he is right-hand dominant.
10. On or about January 7, 2009, a wind storm caused a large limb on a cedar tree in Plaintiff's yard to break off and fall over the rear of Plaintiff's wife's car. Plaintiff used a chainsaw to make two cuts on the fallen limb, and then he and his wife and son removed the cut pieces of the limb from the car so that they could drive the car forward and put a tarp over the broken rear window. Both parties submitted into evidence various photographs depicting the fallen limb, the damage to the rear of the car, and the fallen limb on the car.
11. On January 8, 2009, Plaintiff presented to Goodyear Tire's medical department with complaints of right shoulder pain and received instructions to be placed on an "off standard" work status, which meant that he could return to work with restrictions. This was the last day that Plaintiff actually worked for Goodyear Tire. The next day, January 9, 2009, Plaintiff presented to Mr. Frank Anthony Murray, a physical therapist who works as an independent contractor for Goodyear Tire, with complaints of right shoulder pain for the past two months. Mr. Murray diagnosed Plaintiff with a possible rotator cuff tear.
12. On January 12, 2009, Plaintiff returned to Goodyear Tire's medical department and reported right shoulder pain beginning November 22, 2008 "with pulling/throwing tires." The nurse practitioner on duty ordered right shoulder magnetic resonance imaging (MRI), an orthopaedic referral, and instructed Plaintiff not to use his right arm at all until he saw an *Page 7 
orthopedist. On January 20, 2009, Plaintiff underwent a right shoulder MRI, which revealed that Plaintiff had a full-thickness rotator cuff tear.
13. On February 4, 2009, Plaintiff presented to Dr. Kevin Paul Speer, an orthopedist, with complaints of right shoulder pain "since November when he started a job at Goodyear Tire, which required a lot of heavy lifting." According to Dr. Speer, although Plaintiff "does have some pre-existing shoulder arthritis with a small inferior humeral head spur" and history of previous bone cyst removal and shoulder dislocation, "his shoulder was functioning well with little problem until this injury on the job in November." Dr. Speer concluded that Plaintiff sustained "an on-the-job injury that exacerbated his shoulder pre-existing [sic] condition but also caused a rotator cuff tear" which required a rotator cuff repair.
14. On February 16, 2009, Plaintiff underwent a right rotator cuff repair surgery performed by Dr. Speer. Plaintiff then underwent a course of physical therapy. Although Dr. Speer projected that as of February 25, 2009, Plaintiff would hopefully be able to return to full-duty work by May 16, 2009, Plaintiff's right shoulder complaints did not improve to the point that Dr. Speer ever released him to return to full-duty work.
15. On April 8, 2009, Plaintiff presented to Dr. Speer with complaints of left shoulder pain. Dr. Speer noted that Plaintiff continued to have some arthropathy in his right shoulder joint, but could progress to the next phase of rehabilitation. In addition, Dr. Speer noted that Plaintiff's left shoulder "examines like a rotator cuff tear," and ordered a left shoulder MRI.
16. On June 23, 2009, Plaintiff underwent a left shoulder MRI, which revealed a full-thickness rotator cuff tear. On June 25, 2009, Plaintiff returned to Dr. Speer, who noted "rather significant AC joint osteoarthritis and arthropathy" in the left shoulder. Dr. Speer recommended surgery to repair Plaintiff's left shoulder, and noted that "the source of the rotator cuff tears at *Page 8 
this patient's young age comes from his continued and long standing work activities at the Goodyear Tire plant." Also at this visit, Dr. Speer released Plaintiff to return to work with permanent restrictions of no lifting or carrying over five pounds.
17. On July 31, 2009, Plaintiff underwent a left rotator cuff repair surgery performed by Dr. Speer. Plaintiff then underwent a course of physical therapy. Dr. Speer ultimately assigned Plaintiff permanent restrictions involving both arms of no lifting more than 25 pounds and no repetitive overhead work.
18. Dr. Speer opined, and the Full Commission finds as fact that Plaintiff's duties with Goodyear Tire as a paint booth operator significantly contributed to the development of his right shoulder pathology, including rotator cuff problems, in that such duties structurally worsened his right shoulder to the point that it required surgery. He was of the opinion that "lifting overhead and lifting heavily, repetitively," as required by Plaintiff's job duties, would cause a shoulder break down for someone with Plaintiff's type of pre-existing shoulder history.
19. Dr. Speer also opined, and the Full Commission finds as fact, that Plaintiff's job duties as a paint booth operator, as described to him and depicted in the photographs shown to him, would put an individual at a higher risk, compared to the general population for rotator cuff tendon-based problems.
20. Dr. Speer did not causally relate Plaintiff's left shoulder problem to his job duties. He testified, however, that in his experience at least a third of patients with rotator cuff repairs get an exacerbation of the opposite shoulder symptoms as they transfer a lot of their daily activities to the opposite shoulder. According to Dr. Speer, usually the opposite shoulder symptoms "settle down" as the operative shoulder gets better. Plaintiff's left shoulder did not "settle down" due to his "structural pathology" and the shoulder required surgery before it got *Page 9 
worse. The Full Commission finds that the evidence is insufficient to prove whether Plaintiff's left shoulder condition was due to overuse while recuperating from the right shoulder surgery or from his pre-existing structural pathology. Dr. Speer did not have any recollection of discussing Plaintiff's left shoulder complaints with him. The decision to surgically treat the left shoulder appeared to be based on the need to prevent worsening of a pre-existing condition and MRI findings which do not show whether or when his left shoulder condition got worse.
21. Dr. Summers is an orthopedic surgeon who was hired by Defendants to review Plaintiff's medical records. He testified that Plaintiff's job more likely than not did not cause Plaintiff's right shoulder condition. He based his opinion on Plaintiff's prior history of a right shoulder condition, his understanding that Plaintiff did not officially report any injury until the day after the tree limb incident, and his belief that two to three months on the job was an insufficient period for the development of a massive rotator cuff tear. Essentially, Dr. Summers felt that Plaintiff's shoulder condition and rotator cuff tear predated his employment with Goodyear Tire and were not causally related to his work.
22. Dr. Summers testified, however, that if Plaintiff was substantially asymptomatic before starting his job with Goodyear Tire, developed right arm symptoms a month or two after starting the job, and those symptoms progressed through the date of the tree incident, he would agree that the job duties substantially contributed to an exacerbation of Plaintiff's pre-existing right shoulder condition. The Full Commission finds from the evidence that all of the conditions required for Dr. Summers to opine that Plaintiff's job duties exacerbated his pre-existing right shoulder condition have been proven.
23. With respect to Plaintiff's right shoulder condition the Full Commission gives greater weight to the medical opinion testimony of Dr. Speer, as Plaintiff's treating physician, *Page 10 
over any contrary opinions of Dr. Summers. Based upon the greater weight of the evidence, the Full Commission finds that Plaintiff's job duties as a paint booth operator with Goodyear Tire placed him at an increased risk, over that facing the general population, for developing right shoulder pathology, including a rotator cuff tear and for exacerbating any pre-existing right shoulder condition. Plaintiff's job duties as a paint booth operator also significantly contributed to the development of his right shoulder pathology in that such duties structurally worsened his right shoulder condition to the point that it required surgery. Therefore, Plaintiff contracted a compensable occupational disease as a result of his employment duties with Goodyear Tire, resulting in disability on January 10, 2009. Plaintiff is not contending that he suffered an injury by accident.
24. Defendants' contention that Plaintiff's tree removal activity caused his shoulder problems is unpersuasive. When questioned about Plaintiff's participation in removal of the tree limb from his wife's car, Dr. Speer was of the opinion that heavy work done largely below shoulder level is not as "provocative" as reaching at or above shoulder level and typically would not make the shoulder hurt worse or tear anything. He did not change his medical causation and increased risk opinions after Defendants provided him with pictures and hypothetical questions regarding the tree incident.
25. The Full Commission accepts Plaintiff's testimony as credible.
26. Plaintiff has proven that due to his occupational disease involving his right shoulder he has been unable to work from January 10, 2009 through the present. On January 12, 2009 the Goodyear plant dispensary instructed Plaintiff not to use his right arm at all until he was seen by an orthopedist. On January 20, 2009 Plaintiff underwent an MRI of his right shoulder, which showed a full thickness rotator cuff tear and other pathology. On February 4, 2009 *Page 11 
Plaintiff was evaluated by Dr. Speer, who recommended a rotator cuff repair. Plaintiff underwent the right shoulder surgery by Dr. Speer on February 16, 2009. After his surgery Plaintiff was physically unable to work for more than three months. Dr. Speer initially projected that Plaintiff may be able to return to work at full duty by May 16, 2009, but testified this date was just a hope. On June 25, 2009 Dr. Speer gave Plaintiff permanent restrictions of no lifting or carrying over five pounds and indicated that he was unable to return to his regular work. While recuperating from his right shoulder surgery, Plaintiff had left shoulder problems which required surgery also. This surgery was performed in July 2009. Considering Plaintiff's physical limitations and restrictions as a result of his injury, along with his age, education, work history and other vocational factors, and his unrelated left shoulder problems, it would have been futile for Plaintiff to seek suitable employment during his healing period after June 25, 2009.
27. On the day of his hearing before the Deputy Commissioner on December 17, 2009, Dr. Speer gave Plaintiff permanent work restrictions for both arms of no lifting more than 25 pounds and no repetitive overhead work. Based upon the description of his job duties, Plaintiff could not return to his prior job with Goodyear Tire with the June 25, 2009 or the December 17, 2009 work restrictions. Plaintiff is willing to return to work with Goodyear Tire when a job is offered to him within his restrictions or anywhere else. The evidence does not indicate that Plaintiff has been terminated from his employment. As of the date of the hearing before the Deputy Commissioner, the evidence does not show whether Plaintiff had had an opportunity to clarify his work status with Goodyear Tire or to seek other suitable employment after being given permanent work restrictions on December 17, 2009. Therefore, Plaintiff has shown that he has been temporarily and totally disabled from January 10, 2009 through the present and continuing. *Page 12 
28. With respect to calculating Plaintiff's average weekly wage, the Full Commission finds the fifth method under N.C. Gen. Stat. § 97-2(5) should be utilized due to the short period of time Plaintiff worked prior to his disablement and the fact that Plaintiff missed 19 days during his short period of employment making method three not fair and just to both parties, and there is no evidence of the wages of a similar employee to allow use of method four. Also, Defendants have not met their obligation to submit a completed Form 22 to aid the Industrial Commission in calculation of the average weekly wage.
29. The Full Commission finds that the period from September 23, 2008, Plaintiff's first day of work, through and including January 8, 2009, the last day he was paid, is 108 days. Goodyear Tire paid Plaintiff a total of $8,708.12 during that period. Plaintiff missed eight days from October 26, 2008 through and including November 2, 2008 and 11 days from December 22, 2008 through and including January 1, 2009. Since Plaintiff lost more than seven consecutive calendar days on two occasions during the period he worked, it is fair and just to the parties to deduct these two periods, equaling 19 days, when calculating the average weekly wage. Defendants argue that the 11 days of work missed by Plaintiff in December 2008 and January 2009 should not be subtracted because Plaintiff was paid $549.60 during this period of time. However, the money he was paid during this period of time was for 40 hours of previously-accrued vacation pay.
30. Dividing Plaintiff's total pay by the remaining 89 days yields an average weekly wage of $684.88, which most nearly approximates the amount Plaintiff would be earning were it not for the injury, and is fair to both parties. The compensation rate on this average weekly wage is $456.61. *Page 13 
31. Dr. Speer has not pronounced Plaintiff to be at maximum medical improvement for his shoulder conditions. Further medical treatment for Plaintiff's right shoulder condition is reasonably required to effect a cure, provide relief and/or lessen the period of Plaintiff's disability. The medical treatment that Plaintiff has received for his right shoulder condition has been reasonably required to effect a cure, provide relief and/or lessen the period of Plaintiff's disability.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of his employment duties with Goodyear Tire, Plaintiff contracted a compensable occupational disease involving his right shoulder resulting in disability on January 10, 2009. N.C. Gen. Stat. § 97-53(13).
2. In Rutledge v. Tultex Corp./King's Yarn, the Supreme Court of North Carolina held that in order for an occupational disease to be compensable under the North Carolina Workers' Compensation Act, a plaintiff must prove that the claimed disease is: "(1) characteristic of persons engaged in the particular trade or occupation in which the [plaintiff] is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the [plaintiff's] employment." Rutledge v. Tultex Corp./King'sYarn, 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). In cases where the employment exposed the worker to a greater risk of contracting the disease than the general public, the first two elements are satisfied. Rutledge, 308 N.C. at 93-94, 301 S.E.2d at 365. *Page 14 
3. Plaintiff has shown that his job with Goodyear Tire placed him at an increased risk, over that faced by the general population, for contracting the type of shoulder pathology that he experienced and that his job significantly contributed to the development of his right shoulder pathology, or the exacerbation of his pre-existing right shoulder pathology, to the point that it became symptomatic and required surgical intervention. As such, Plaintiff has shown that he contracted a compensable occupational disease, right shoulder pathology, including a rotator cuff tear, while working for Goodyear Tire. Rutledge, 308 N.C. at 93-94, 301 S.E.2d at 365.
4. Plaintiff has not shown by the greater weight of the evidence that his left shoulder condition developed as a result of his job duties or as a direct and natural result of his compensable right shoulder condition and/or the treatment therefor. Holley v. ACTS,Inc., 357 N.C. 228, 581 S.E.2d 750 (2003); Young v. HickoryBusiness Furniture, 353 N.C. 227, 538 S.E.2d 912 (2000).
5. For the reasons stated in Finding of Fact numbers 26 and 27 above, Plaintiff has shown that he has been temporarily and totally disabled from January 10, 2009 through the present and ongoing because of his compensable right shoulder condition. During part of such period, he was either medically taken out of work or physically unable to work in any employment because of his compensable condition. During other periods he was unable to return to work due to permanent work restrictions which prevented him from returning to his prior job and when combined with his other educational and vocational factors made it futile for him to seek employment elsewhere. As of the date of the hearing before the Deputy Commissioner, the evidence does not show whether Plaintiff had had an opportunity to clarify his work status with Goodyear Tire or to seek other employment after being given permanent work restrictions. As such, Plaintiff is entitled to receive temporary total disability compensation *Page 15 
from January 10, 2009 through the present and ongoing until further order of the Commission. N.C. Gen. Stat. §§ 97-2(9) and 97-29;Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
6. The average weekly wage of $684.88 with corresponding compensation rate of $456.61, is reached by utilizing the "fifth method" of N.C. Gen. Stat. § 97-2(5) and is fair and just to all parties.
7. Plaintiff is entitled to have Defendants pay for the medical treatment he has heretofore received for his compensable right shoulder condition with and/or at the direction of Dr. Speer, including but not limited to diagnostic testing and imaging, surgeries, prescriptions, physical therapy and mileage. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
8. Plaintiff is entitled to have Defendants provide him with further medical treatment for his compensable right shoulder condition for so long as such treatment is reasonably required to effect a cure, provide relief and/or lessen the period of his disability. N.C. Gen. Stat. §§ 97-2(19), 97-25 and 97-25.1.
9. The issue of whether Defendants are entitled to a credit for "AS benefits" paid to Plaintiff is deemed abandoned.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Subject to the attorney's fee provision below, Defendants shall pay to Plaintiff, in a lump sum, temporary total disability compensation in the amount of $456.61 per week for the period from January 10, 2009 through the present. Defendants shall also continue to pay *Page 16 
ongoing weekly temporary total disability compensation to Plaintiff in the amount of $456.61 per week until Plaintiff returns to work or until further Order of the Commission.
2. As Plaintiff's attorney's fee, Defendants shall deduct 25 percent of the lump sum amount due per Paragraph 1 above and pay such portion directly to Plaintiff's counsel. Defendants shall also make every fourth ongoing weekly temporary total disability check payable directly to Plaintiff's counsel.
3. Defendants shall pay for the medical treatment Plaintiff has heretofore received for his compensable right shoulder condition, including but not limited to diagnostic testing and imaging, surgeries, prescriptions, physical therapy and mileage. To any extent Plaintiff and/or any third-party payor has paid for any such treatment, Defendants shall reimburse such payor(s) according to the fee schedule.
4. Dr. Speer is hereby designated as Plaintiff's treating physician for his compensable right shoulder condition, and Defendants shall, subject to the limitations period of N.C. Gen. Stat. § 97-25.1, authorize and pay for further medical treatment for Plaintiff's compensable right shoulder condition.
5. Defendants shall pay the costs of these proceedings.
This the ___ day of April 2011.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING: *Page 17 
 S/_____________ LINDA CHEATHAM COMMISSIONER
 S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1